BISCHOFF *v.* HARRIS.

1. BREACH OF PROMISE OF MARRIAGE—EVIDENCE—ADMISSIBILITY.
   In actions to recover damages for breach of promise of marriage, aggravated by seduction, a wide range of inquiry as to the conduct of the parties during the existence of the claimed contract, as well as the causes attending the breaking of the engagement, is permissible.

2. SAME—SEDUCTION—DAMAGES—INSTRUCTIONS.
   In an action to recover damages for breach of a marriage promise, aggravated by seduction, where the theories of

the parties are simple and are stated in their essentials by the court in its charge, it is the duty of a party desiring a more explicit statement of his claims to present requests therefor to the court.

3. SAME—DAMAGES—EXCESSIVE VERDICT.
In an action to recover damages for breach of marriage promise, aggravated by seduction, a verdict for $5,000 *held*, excessive to the extent of $2,500.[1]

Error to Wayne; Hally, J. Submitted April 17, 1917. (Docket No. 57.) Decided September 27, 1917.

Case by Ellen R. Bischoff against Frank R. Harris for breach of promise of marriage. Judgment for plaintiff. Defendant brings error. Affirmed, conditionally.

*James H. Pound,* for appellant.

*William Henry Gallagher* and *Francis T. McGann,* for appellee.

KUHN, C. J. This is an action to recover damages for breach of promise of marriage, aggravated by claimed seduction of the plaintiff by the defendant. The trial resulted in a verdict for the plaintiff in the sum of $5,000, upon which judgment was duly entered.

At the time of the trial plaintiff was a widow about 41 years of age and the mother of two children. The defendant, a brother of plaintiff's sister's deceased husband, was a man of about 37 years of age. While they were relatives, they had seldom been together, and knew little of each other until in November, 1911, a year and a half after the death of plaintiff's husband, when the events which led up to this litigation commenced. At this time they met by chance in the office of the township treasurer, and the defendant called upon the plaintiff a short time later as the re-

---

[1] On measure of damages for breach of promise to marry, see comprehensive note in 41 L. R. A. (N. S.) 840. Particularly as to excessiveness of damages, see page 853 of above note.

sult of an invitation extended to him by her. From this time on until the last of the following April they continued to go together, at which time all relationship of an affectionate nature ceased, and the defendant discontinued his calls upon her. That he asked her to marry him soon after he called upon her is not disputed, nor is the fact that in the latter part of November intercourse commenced between the parties. The essential matters in dispute are whether or not the plaintiff accepted the offer of marriage made by the defendant, whether or not the defendant later repudiated the offer and refused to marry the plaintiff, and whether or not intercourse was indulged in as a result of the promise of marriage.

The plaintiff's claim was, and proof was offered tending to show, that the courtship began in November, and in a few weeks culminated in an engagement to marry, the marriage to occur about New Year's following; that shortly after the engagement the defendant sought the help of plaintiff in procuring a strip of property necessary for ready access to his own; that she readily consented to help him, and advanced her own money to purchase the property in question, procured a deed for the same, and then executed and delivered a deed to the defendant; that he failed to reimburse her, and that she complained to him concerning it, whereupon he rebuked her for distrusting him, which, it is her claim, was their first disagreement; at Christmas time the parties came to Detroit to buy presents, and the plaintiff, desiring to purchase defendant a present, left him, agreeing to meet him later; she did meet him, and found him sullen and angry and suspicious of her absence, which resulted in another misunderstanding, which was smoothed over on Christmas Day, when the presents were exchanged; that between Christmas and New Year's the defendant suggested that the plaintiff

lighten her household duties in preparation for the marriage by obtaining hired help; that they went to her aunt's home, where they announced that they were going to get married, and through this aunt obtained a hired girl, who came to her house soon after New Year's; that on Sunday following New Year's, 1912, the defendant came to the plaintiff's house unexpectedly and discovered there a Mr. Smiley, who had bought the plaintiff's husband's business; that after Smiley left the defendant became suspicious, and the plaintiff explained to him that Smiley had been there to look over some papers in connection with the business, and that defendant charged her with having had improper relations with Smiley, and, after a long and bitter quarrel, demanded of her that she submit her person to him in order to prove her fidelity to him, to which demand she finally yielded; that when the hired girl came the plaintiff announced her readiness to marry, but the defendant demurred, saying that he understood that the plaintiff had no dower in her husband's estate, and suggesting that she give him $6,000 in cash, of which she was custodian as administrator of her husband's estate; this she refused, and the defendant thereupon asked her for a copy of her husband's will to have his attorney see if she could get her dower interest; that the defendant said that he would not marry her unless the $6,000 was forthcoming; several times thereafter they had quarrels of more or less serious nature, and that during one of them the defendant threatened to kill the plaintiff, and tried to get a revolver that she kept in her house; that she took the revolver and gave it to her little boy, who ran from the house with it, and she followed him to a neighbor's; that finally plaintiff offered to sign off all rights in his property if he would marry her for 24 hours and she allow him to divorce her then, which he also refused to do.

The defendant's claim of what occurred during the interval of time from November, 1911, to the last of April, 1912, differs materially from the claims of the plaintiff. It was his claim that he tendered marriage to the plaintiff, but was flatly rejected for the reason that, by marrying, the plaintiff would lose all rights in her husband's estate in accordance with the terms of the will of her husband. He denies that he demanded $6,000 from her as a condition of the marriage to be entered into by him and that the intercourse had between them was preceded by a promise of marriage; that soon after he commenced going with her she invited him to her house to a party by a note delivered by her little boy, in which she asked him to tell his people that he would not be back that night; that after the party he did spend the night with the plaintiff, and they had intercourse; and that thereafter he spent a large portion of his nights with the plaintiff.

The issues of fact were presented to the jury in a clear charge, with the result as above indicated. The case is brought to this court, and 103 assignments of error are urged by the learned counsel in support of his claim that the judgment should be reversed. In the discussion of this large number of assignments of error counsel, for convenience, has grouped them as follows: (1) Errors during the course of the trial in the admission and rejection of testimony and the ruling of the court thereon; (2) refusal of the requests to charge of defendant, were refused, and their modification, where so treated; (3) errors in the charge itself; (4) error in the proceedings after the verdict in the motion for a new trial and the decision thereupon; (5) error in not reducing the amount of the verdict.

In the consideration of the first group of assignments of error it should be stated that a number of the assignments are based upon no objection in the record. A wide range of inquiry was permitted by the

circuit judge as to the conduct of the parties during the existence of the claimed contract as well as the causes or circumstances attending the breaking of the engagement. This we think is proper in cases of this kind. *Simmons* v. *Simmons,* 8 Mich. 318; *Vanderpool* v. *Richardson,* 52 Mich. 336 (17 N. W. 936) ; *Rutter* v. *Collins,* 96 Mich. 510 (56 N. W. 93).

With reference to those assignments of error as to the admission and rejection of testimony where proper objection was made, it would not be profitable to enter upon the discussion of the various claims made by counsel, but it is sufficient to say that we have examined these various assignments, and do not believe that it can be said that prejudicial error was committed by the court in his rulings with reference thereto.

The learned trial judge, in a clear and comprehensive charge, submitted the questions of fact to the jury. Counsel for defendant strongly urges that the court did not set forth the theory of the defendant with the same clearness that characterized his exposition of the theory of the plaintiff. A reading of this charge does not impress us that the charge is fairly subject to this criticism. The theories of the parties were simple and are stated in their essentials. If defendant's counsel desired to have a more explicit statement of his claims presented, it is his duty to present requests to the court.

In the denial of the motion for a new trial the trial judge said:

"Defendant denied the existence of a promise to marry, and said that the seducing was as much upon her part as it was upon his. The testimony disclosed that he is worth in the neighborhood of $40,000. This consists entirely or almost entirely of land.

"A motion was made for a new trial, and at first I was impressed with the idea that the verdict was excessive, because in this case with a mature woman

it was my notion that little respect should be given to the story of seduction.

"I have desired, if it was legally possible to do it, to cut the verdict in two. I have concluded, however, that I have no such power. I have examined cases in Connecticut, Illinois, Indiana, Iowa, Minnesota, Nebraska, New York, Tennessee, Texas, and Wisconsin, and the overwhelming weight of authority is that in this class of cases the amount of the verdict, unless it clearly is the result of passion, prejudice, or a reckless disregard of the evidence, rests in the sound discretion of the jury."

In discussing the question of damages, the trial judge in his charge said:

"Now, you have not any right, as you have already been told, if you get to the question of damages, to consider that this man can afford to pay a certain amount, looking at the thing entirely from this point of view. The testimony that was offered respecting his financial position and his financial standing, the testimony that was offered respecting the conduct and the habits and the life history of these two people, is all offered and given and permitted to come into court so that you may have before you such testimony as will permit you to judge rightfully. A woman who is about to marry, or who has a promise to marry a man that is worth $100,000, and is deprived of consummating that marriage by something that that man has done, or by his refusal to do it, has been deprived of more, in a worldly way, than the woman who is engaged to marry a man who is worth $10."

We are of the opinion that this illustration referring to the man who is worth $100,000, under the circumstances of this case, was unfortunate, for the reason that defendant's pecuniary responsibility was one of the questions in dispute. As the learned trial judge stated in his reasons for denying the motion for a new trial, the testimony fairly indicated that he was worth approximately $40,000 in real estate.

A careful studying of this record leaves the impression upon us, as it seems to have upon the trial judge,

198—Mich.—5.

that something other than the mere testimony in the case must have actuated the jury in giving the amount of the verdict that they did. It is true that a verdict should not be lightly disturbed in cases of this kind, but we cannot escape the conclusion that to allow this verdict to stand in its present amount would be a palpable miscarriage of justice. We are inclined to the view, as was the trial judge, that the verdict should be reduced at least one-half, and unless counsel for plaintiff within 30 days elect to accept a reduction of the verdict to the sum of $2,500, a new trial will be granted, with costs to the appellant. In case counsel elect to accept the reduction of the verdict, the judgment will stand affirmed at that amount, with costs to the appellant.

STONE, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.