Agnes GOLDEN, Appellant,

v.

Junior Ray GOLDEN, Respondent.

No. 48517.

Supreme Court of Minnesota.

Aug. 3, 1979.

William B. Randall, County Atty., and Steven C. DeCoster, Asst. County Atty., St. Paul, for appellant.

Seltz, Tolaas & Jensen, John F. Ebner, and Russell J. Jensen, St. Paul, for respondent.

TODD, Justice.

Plaintiff, Agnes Golden, appeals from the judgment and the order denying her post-trial motions entered in the Ramsey County District Court. The basis of her appeal is that the presumption of legitimacy for children conceived in wedlock requires a finding that defendant, Junior Ray Golden, is the father of her child. We affirm.

Plaintiff, a 29-year-old woman at the time of trial, first met defendant, her former husband, in June 1973 while both were employed at Fort Snelling in the Air National Guard. Although defendant was married at the time, they began seeing each other. Defendant's announced divorce led to more frequent meetings and a pattern of sexual relations regularly two or three times per week. Plaintiff discontinued the use of a contraceptive in September 1973 when the parties spoke of marriage.

The couple traveled to Florida and remained there for approximately 6 weeks, until defendant learned that his divorce had become final. Thereafter, the parties returned to St. Paul and, on October 27, 1973, were married in Watertown, South Dakota.

From the time of their marriage, both parties appear to admit that their relationship steadily declined. Throughout November they apparently lived together in Red Wing and had sexual relations two or three times per week. The parties disagree about the facts occurring after November 1973 which are particularly relevant to this action.

Plaintiff's version is essentially that the couple's frequent arguments led her to visit her sister in St. Paul on many occasions in November and December, that she had no male friends during this time, and that she did not have intercourse with anyone but her husband during November and December. Further, she testified that she moved into an apartment in St. Paul with a female friend in mid-December, but again did not have intercourse with anyone but her husband during this period.

The defendant's account of that time period includes more specific details of their actual contact.

He stated that they separated at some time between December 5 and 9, 1973, and agreed that a number of arguments led plaintiff to more frequent and lengthy visits to St. Paul. Specifically, he stated that plaintiff was often gone from Thursday or Friday through the weekend. He introduced evidence of a phone bill of $150 which he claims exemplifies his futile attempts to reach her at her sister's residence; he argues that she was often not at home. Additionally, he recounted several occasions where he saw her either alone or with her sister in the company of men at the West Sider Bar. Finally, he testified that he could not remember having sexual relations with his wife after the end of November until their temporary reconciliation in late January 1974.

That reconciliation was temporary and when plaintiff informed him in January that she was pregnant, their arguments increased. They separated permanently in March 1974 and the divorce was final in May 1974.

The record indicates that plaintiff had a normal 28-day menstrual cycle and that

while her period in November was also normal, her December period was spotty and shortened. Plaintiff missed her January period, consulted a physician, and was informed on January 31, 1974, that she was pregnant. Her examination on May 8, 1974, resulted in an estimated delivery date of September 12, 1974, but the male child, Nathan, was actually born on August 25, 1974.

When plaintiff first applied for AFDC benefits, she represented that the father was "a man from California." She apparently continued to represent that defendant was not the father of the child as evidenced by a conversation between plaintiff and defendant's attorney during the marriage dissolution proceedings to the effect that the child was "not of our marriage." At some time after the dissolution proceedings were concluded, when Nathan was approximately 6 months old, plaintiff decided that it was time "to stop lying" and informed the welfare department that defendant was the child's father. This action was commenced approximately 1 year thereafter.

The record does not indicate whether or not the parties participated in a blood test. In *State ex rel. Ortloff v. Hanson,* 277 N.W.2d 205 (Minn.1979), we suggested that the legislature study the use of blood testing in the context of paternity actions, noting the apparent accuracy of the testing procedures.

The issue of defendant's alleged paternity was submitted to a jury which returned a verdict for defendant. Subsequent thereto, plaintiff moved the court for a new trial, or, alternatively, for judgment notwithstanding the verdict. The denial of the post-trial motions was followed by this appeal.

The sole issue for our consideration is whether, as argued by plaintiff, the presumption of legitimacy of a child conceived during wedlock is rebuttable only by conclusive proof of impossibility or incapacity, and, absent such proof, defendant's paternity is established as a matter of law.

Plaintiff relies heavily upon this court's decision in *Haugen v. Swanson,* 219 Minn. 123, 16 N.W.2d 900 (1944), as illustrative of the presumption favoring the legitimacy of children conceived during marriage. We there held that absent a situation where all possibility, or at least all reasonable probability, of the husband's parenthood of the child is excluded by proof of miscegenation, impotency, or reliable blood tests, the presumption of legitimacy of a child conceived during the period in which the parties were occupying the same dwelling is conclusive. The facts presented indicated that these parties had occupied the same dwelling for at least 2 or 3 weeks of the 6-week period of possible conception. The defendant had attempted to rebut the evidence by continued assertions that the parties had not had intercourse for more than 2 years prior to conception. We held that the recorded facts and assertions were insufficient to constitute the clear and satisfactory proof necessary to overcome the strong presumption.

The genesis of that presumption of legitimacy for children conceived during marriage was the obvious social policy which it advanced. In historical application, the presumption and its limitations have exhibited a continuing response to societal needs. See, *State v. Soyka,* 181 Minn. 533, 233 N.W. 300 (1930); *Meemken v. O'Hara,* 243 Minn. 138, 66 N.W.2d 601 (1954); *State v. E. A. H.,* 246 Minn. 299, 75 N.W.2d 195 (1956); and *Curry v. Felix,* 276 Minn. 125, 149 N.W.2d 92 (1967).

■ An accumulation of the disputed facts presented in the instant case exemplifies the difficulty of a strict application of the presumption in all but the exceptional cases acknowledged in *Haugen v. Swanson, supra.* The facts as alleged by the defendant would, if accepted, tend to exclude all reasonable probability of his parenthood of the child upon the ground of nonaccessibility.

Under the circumstances presented, the trial court was correct in viewing the presumption as not conclusive and in submit-

ting the disputed factual questions to the jury for resolution. While it is true that the presumption by its very terms both encompasses and addresses the accessibility question, there remain factual components of accessibility which may be challenged by affirmative evidence directed to establishing the date of conception and the relationship of the parties.

Medical testimony, as is common in areas of this nature, was not definite in establishing the date of conception. However, the physical development of the child at the time of birth, 6 pounds and 19 inches in length, was in the low average range, and that development, together with the occurrence of the birth approximately 3 weeks before the established delivery date, could well have supported a conclusion that conception occurred at some time after the alleged physical separation of the parties.

It is in this regard that the instant case differs from the *Haugen* analysis. In the latter case, there were allegations by the husband of nonaccessibility, unsupported by affirmative evidence. Under the record before us, the very elements that have traditionally served as the essence of the presumption are at issue. It is our view that in those limited instances where such a basic challenge is made and the trial court is convinced that an application of the presumption would be inappropriate, the matter may be submitted to the jury for ultimate resolution.

The jury reviewed the competing allegations with regard to the accessibility and conception questions and concluded that defendant was not the father of the child. While critical affirmative evidence of plaintiff's actual association with another man is not found in the record, the jury was probably influenced to some degree by plaintiff's statements prior to trial designating another as the father and the inconsistency which resulted in later commencing the action against defendant and her supportive statements in that regard at trial.

Viewing the record as a whole, the verdict is not manifestly and palpably contrary to the great weight of the evidence. *Carpenter v. Mattison,* 300 Minn. 273, 219 N.W.2d 625 (1974).

Affirmed.